## Coleman *et al. versus* Blewett.

*Construction of Agreement for Partition of the " Cornwall Estates."*

The joint owner of lands on which were valuable ore-banks agreed in 1786 to a partition, but finding this difficult, agreed in 1787 that equal partition should be made of the furnace forges, lands, houses, and other real estate, provided that "the ore-banks" "should remain together and undivided as a tenancy in common," the parties interested to have certain portions, for which purpose an "*accurate survey*" was to be made if not already done, neither party to interfere with either of the others at any mine-hole by them opened or occupied for the purpose of mining iron-ore: to this was added a supple-

[Coleman *et al. v.* Blewett.]

mental agreement, executed on the same day, providing that if veins of ore should extend beyond a survey lately made by Thomas Clark, the parties, their heirs or assigns, should have free ingress, &c., to and from said "*mine-hills,*" and free liberty to dig and carry away "*any ore* that may be found to extend beyond the limits of said survey."

In an action of trespass by a tenant of two of the joint owners, against certain others of the owners, for taking and carrying away copper-ore which he had mined from the base of one of the hills outside of the Clark survey as relocated by one Weidle, it was *Held,*

1. That under the agreement of August 30th 1787, the whole of the mine-hills was exempted from partition, and was to be held in common, and that *within the natural boundaries* of the three hills, either of the parties had the right to take out any ore that might be found, such a construction being according to the terms of the agreements, the usage of the parties at that date and subsequently, and equitable :

2. That the Clark survey of the mine-hills not proved to have been adopted by the parties to the original agreements nor annexed to them, nor incorporated therein, nor in any manner made a part thereof, dependent upon traditional knowledge by which it had been relocated by surveyor Weidle, but which other surveyors could not locate, and which as located by Weidle did not embrace all the ore, nor all of the hills in question, must be set aside and disregarded as not the "*accurate survey*" by which the parties meant to hold the mine-hills in common: and,

3. That the Clark survey being thus set aside, the plaintiff had the right to mine copper-ore from the mine-hills, and was entitled to recover from the defendants in the action of trespass.

ERROR to the Common Pleas of *Lebanon county.*

Two suits were brought in the Common Pleas, March 16th 1860, by Benjamin Blewett, the one an action on the case, the other an action of trespass *vi et armis* against Robert W. Coleman and Artemus Wilhelm, for interrupting the plaintiff in his mining operations at the Cornwall Mines in Lebanon county, in each of which, under the ruling of the court below, there was a verdict and judgment in favour of the plaintiff.

This case has been so often before this court (see 7 Harris 100, 11 Id. 393, and 4 Wright 45), and the facts are so fully recapitulated in the following opinion, that it is thought unnecessary to re-state them here.

The case was argued by *James L. Reynolds* and *A. R. Boughter* for plaintiff in error, and by *W. Darlington* and *Josiah Funck* for defendants in error.

The opinion of the court was delivered, June 26th 1862, by

WOODWARD, J.—It has been our misfortune to differ from the learned judge below in the construction of the agreements made in 1787 by the ancestors of the present race of Colemans and Grubbs, touching their valuable mine-hills. He held the hills to be divisible like other estates in common, and awarded a writ of partition, notwithstanding the owners had expressly covenanted with each other that the hills should "remain together and un-

7 WR.—12

divided as a tenancy in common." We gave effect to the title-papers according to their terms, and forbade the partition : Coleman *v.* Coleman, 7 Harris 100.

Then the next case that came before us was one in which the Colemans had undertaken to sue the Grubbs in trespass for taking some lumps of ore called niggerheads, that lay scattered on the surface of the hills, partially imbedded in the soil, and they produced a draft of what has since been called the Clark survey, a paper with the name of Thomas Clark written on it, but without date. Clark having been long dead, Jacob Weidle, a surveyor, was examined, who produced a draft of the mine-hills made by him on the basis of what he called a survey, "purporting" to have been made by Clark, but he found no posts or stones set to indicate Clark's survey, and he found that it did not extend to the foot of the hills. Hoffer, another surveyor, stated that he could not locate on the ground the alleged survey by Clark. H. D. Rogers testified that Clark's survey did not embrace all the ore. J. E. Rogers said it did not embrace near all the hill then in question. Another witness said the Clark survey was two hundred yards from the top of the hill, and in places about as far from the bottom ; and other witnesses who had been well acquainted with the hills for periods varying from seven to forty-eight years, some as proprietors and others as miners and workmen, declared that they never had seen or heard of lines on the ground limiting the ore digging. Still the Colemans insisted in that action that what was below the Clark lines belonged to them in severalty, that only which was above the lines being the estate reserved as a tenancy in common. The court submitted the evidence of the survey by Clark to the jury, but held that the plaintiff could not recover, whether the niggerheads were taken above or below the Clark lines, because, under the agreements of 1787, the defendants had a right to mine within or without these lines. The jury failed to find the survey, and we affirmed the judgment because we did not consider the Clark survey, as proved by Weidle, that "accurate" survey which the parties stipulated for in 1787, and because we held the hills, and the whole of each of them, to be retained as a tenancy in common. We could not apply the stipulation in the agreement concerning *veins* of ore to those unstratified masses which lay scattered over the surface of the hills, but seeing that the niggerheads were parts of the hills, we regarded them as held in common : Coleman *v.* Grubb, 11 Harris 393.

Having thus decided, in two cases, that the hills, as natural objects, were indivisible, and that all the ores in them belonged to the present owners of the title as tenants in common, we certainly did not expect to hear of any more actions of trespass between them. But last year the present case came up. Blewett,

[Coleman *et al. v.* Blewett.]

under the authority of the Grubbs, as he alleged, had mined copper ore on one of the hills below the lines of the Clark survey, as run by Weidle, and Coleman had forcibly taken possession of the mined ore and appropriated it.    Blewett sued him in trespass.    Among other rulings the learned judge held the Clark lines to limit the common estate, and Blewett lost his ore.    We reversed the judgment on the ground again that the *whole* of the hills was the estate in common, whether above or below Weidle's survey of the Clark lines, or whether consisting of iron or copper ore.    See the case reported in 4 Wright 45.    The learned judge, with evident dislike of our ruling, applied it, on the retrial, though in terms that carry it much beyond the instructions he received, as will be seen when we come to notice the charge particularly.    Blewett obtained the verdict and judgment, and the other side now bring the case here and ask us, as they have good right to do, to review the grounds of our former judgment. Counsel intimate that the case would not have come back but for a mistake of fact into which I fell in writing the opinion last year.    My mistake was in speaking of the Clark survey as having at no time been produced in evidence.    The impression of the moment was that it had not made its appearance in the partition suit, and that in the trespass suit, reported in 11 Harris, as well as in the present case, Weidle's draft of the Clark survey, which was what I had before me, was the only draft which had been before the jury.    In this I was mistaken, as the voluminous record, had I been careful to consult it on a point of so little moment, would have informed me.    Of what consequence is the mistake now that it has been pointed out and frankly confessed?    Nobody ever doubted, so far as I know, that Weidle had run and laid down the Clark lines as correctly as any surveyor could do.    Our ground for setting aside the survey was not that it was Weidle's copy instead of Clark's original draft, but that whenever or by whomsoever made, it was not a survey *of the true boundaries of the mine-hills.*    This is our insuperable objection to that survey.    We have held uniformly, and as yet we see no reason for a change of opinion, that the whole of the three hills, as complete natural objects according to their topographical configuration, were exempted from partition, and retained as an estate in common, and not merely that part of them which lies above the lines that Weidle runs around them in pursuance of the draft known as the Clark survey. Such being the substance of our opinion, we cannot attach the least importance to the erroneous allusion that was made last year to the particular draft that had been given in evidence, and it was hardly worth while to bring the case here to get so insignificant a mistake corrected.

But are we right in insisting that nothing less than the entire

hills is the estate reserved to be held in common? or, to put the same question in another form, are the hills which were reserved in common, to be measured according to their natural boundaries or according to the Clark survey? It is due to the plaintiff in error that our opinion on these questions be expressed more fully than it has been heretofore.

On the 6th day of May 1786, Curtis Grubb, Robert Coleman, and the minor children of Peter Grubb, deceased, were owners as tenants in common of Cornwall Furnace, Hopewell Forges, Union Forge, ore-banks, lands, &c., in what was then Lancaster now Lebanon county. The parties on that day entered into an agreement (the minor children being represented by their guardians) with a view to the partition of the whole estate into severalty. These mine-hills were part of the estate. Seven men were selected to make the necessary valuation, appraisement, and partition, and amicable actions were agreed to be entered in the Common Pleas of Lancaster county to give legal effect to their award. Cornwall Furnace was to be assigned to Curtis Grubb and Robert Coleman; two-thirds of the ore-banks were to be allotted to them, and one-third to the heirs of Peter Grubb; and abstracts of all title-papers were to be delivered within a month after the agreement to Thomas Clark, Bartram Galbraith, and James Webb, three of the referees for the "purpose of making such surveys as are necessary." Such in brief was the arrangement agreed upon in 1786, for partition of these mine-hills, and the valuable estate of which they were a part. No doubt an earnest effort was made to accomplish the wishes of the parties. Thomas Clark was the surveyor, and it is not unreasonable to suppose that he examined and mapped out every part of the estate. Though the "Clark survey" now in question is not identified as one that he prepared during that year, yet it is a fair inference that, seeing that the mine-hills were to be divided between two interests, one represented by Curtis Grubb and Robert Coleman, and the other by the heirs of Peter Grubb, he should have prepared this very draft, as exhibiting his views of a possible division between them. He certainly did make a draft of the residue of the estate, and I see no adequate reason to doubt that he made this draft of the mine-hills as an experimental proposition for executing the agreement of the parties.

Whether this conjecture be well or ill founded, however, it is certain that after more than a year of mutual and earnest effort to make partition under the agreement of May 1786, it was found to be impracticable, for on the 30th day of August 1787, we find the parties together making a new agreement. They recited that it had been found, after the fullest investigation, that the former agreement could not be carried into effect without the greatest injustice to some of the parties, and therefore to

remove all difficulties they agreed that the persons appointed in the former agreement, with the substitution of Thomburg for Potts, should make equal partition of Cornwall Furnace, Hopewell Forge, and all the lands, plantations, houses, and other real estate of the parties, "provided always, and it is hereby agreed that the ore-banks belonging to Cornwall Furnace shall remain together and undivided as a tenancy in common, the said Curtis Grubb being entitled to three sixth parts thereof, the said Robert Coleman being entitled to one sixth part thereof, and the said minor children being entitled to the remaining two-sixth parts thereof, and that for this purpose an *accurate* survey shall be made of the said *ore banks and hills*, if not already done, and it is hereby declared to be the true intent and meaning hereof, that neither of the said parties, their agents or workmen, shall interrupt either of the other parties at any mine-hole by them opened and occupied for the purpose of mining iron-ore." The agreement then went on to regulate other details which are not material for any present purpose.

Now if we place ourselves in the midst of these parties, in imagination, can we not catch the thought that inspired them? Have judges any excuse for misunderstanding parties who have expressed themselves so clearly? What were the "*difficulties*" which the "*fullest investigation*" had revealed to them? Evidently that these ore-banks and mine-hills could not be divided into several estates "*without the greatest injustice to some of the parties.*" What was the remedy proposed and adopted? That they should "*remain together and undivided as a tenancy in common.*" What should remain together, half of the hills or the part above the Clark lines? Not a word of it. But "*the said ore banks and hills*" shall remain together and undivided as a tenancy in common. Mine-holes had been made by the respective parties long before Clark made any survey, and of course with no reference to his lines. These mine-holes were to be possessed by the party making them, and neither party was to interrupt the other in his appropriate mine-hole. The rest of our estate, said the parties in effect, is divisible; let it be divided. These hills, so full of wealth for us all, cannot be divided; let us retain them in common, and enjoy them as heretofore. It seems to us that this was so plainly the meaning of the paper that a wayfaring man need not err therein.

We hasten to notice the supplemental agreement executed the same day. It would seem that after the above-named paper had been executed, somebody suggested that veins of ore might "extend beyond the limits of the survey made lately by Thomas Clark." That was the suggestion. Let us suppose that it came from Clark himself, for he was present, and witnessed both agreements. We may presume him to have said to the parties, "You must remember

[Coleman *et al. v.* Blewett.]

that I ran lines around the hills with a view to dividing them, that these lines were in many places far above the base of the hills. Suppose a miner of one of you strikes a vein of ore above these lines, is he to stop when he comes to my lines?" It is quite conceivable that such a suggestion was likely to be made by a surveyor, who attached more importance to his survey than to the covenant of the parties which disregarded it, though it was in fact a very idle, and, as the sequel proved, a very mischievous suggestion. But how did the parties answer it? By stipulating that Robert Coleman and the heirs of Peter Grubb should have "*full liberty and privilege of ingress, egress, and regress to and from said mine-hills, and shall have free and uninterrupted liberty and power to dig, sink shafts, drive drifts, raise and carry away any ore that may be found to extend beyond the limits of said survey.*" Never was an impertinent suggestion of a surveyor, or anybody else, more effectually answered. It was in effect telling him, "your lines, run for a purpose which, upon the fullest investigation, has been found impracticable, are now to be disregarded. Veins of '*any ore*' are to be mined as if you had never made your lines. We are going to retain the hills in common as an undivided estate, and therefore not only may *veins* be pursued beyond your lines, but full right of ingress and mining privileges are secured to the parties as to the hills—the whole hills, whether in group or individually.

The sentence, be it observed, has two distinct members, one of which relates to the hills as natural objects, the other to veins of any ore that may permeate them, and both together assure a full mineral right.

We said when the case was here last year, that this allusion to the Clark survey, in the supplemental agreement, was not for the purpose of *restricting* the rights of the parties, but rather for the purpose of extending them—or at least of rescuing them from any abridgment by reason of the lines Clark had run around the hills: 4 Wright 51. Such is our opinion still. We conceive that the parties solemnly covenanted with each other that the much-talked-of Clark survey should be set aside, and therefore, in obedience to their will, we set it aside. The learned judge himself seemed to have disregarded it in Coleman *v.* Grubb, 11 Harris 401, and only returned to it in this case, when his sudden affection for it grew so strong that it betrayed him into the imprudent assertion that "the construction put on all these writings by the Supreme Court subverts the intention of the parties." If this accusation be true (whether it be consistent with the decorum of the bench we will not stop to say), then it follows that the parties intended to divide part of the hills, and retain only the residue in common. If so, whence came the "difficulties," which could not be surmounted by more than a

[Coleman *et al. v.* Blewett.]

year's labour of themselves and their picked men? If they could divide the base of the hills up two hundred yards, why could they not divide the other two hundred yards, to the top of the hills? The minerals were quite as numerous, as valuable, and as much intermixed at and near the base as at and near the summit. Again, it may be asked, if they intended to retain in common only so much of the hills as some future surveyor should be able to say was above the unmarked and unrecorded lines of the Clark survey, why did they not say so? Judge Yeates, who was one of the guardians, was very competent to express that thought, if it existed in his mind, and is not the absence of expression evidence that no such thought existed? Why were no durable marks or monuments of the Clark survey placed upon the ground? Why was not the draft made part of the agreement, or annexed to it, and spread upon the record as a muniment of title? Why were employers and miners, for a whole generation, left to blunder on in ignorance of the Clark lines? Why were these lines marked only on a paper, left to be disputed about by surveyors and lawyers—not found by one jury and found by another—set aside at one time by a judge, when detached masses, not veins, of ore were in question, and insisted upon by the same judge, when veins, not detached masses, of ore were in question?

These are some of the inquiries which are forced upon the mind, by the assertion that we subvert the intention of the parties, when we construe their agreement as reserving the entire hills in common for the benefit of all their successors in title. If they did not intend that entire reservation, their language was most unfortunately chosen. If they did intend it, their language was most appropriate and expressive.

And there is equity, too, in our construction. These hills have become immensely valuable. Blewett found his copper-ore near the base of the middle hill, and more precious ores still may appear as mining progresses. Varieties of iron-ore that were valueless in 1787, are become extremely valuable to the modern furnace. With a wise forecast the ancestors of the present owners determined to retain these remarkable deposits of ores in common, that each one of themselves and their descendants might participate in the profit and advantage of mining and using them. Against all selfish efforts to appropriate the best part of them to certain owners to the exclusion of other equal owners, stands our construction of the papers. We believe it to be according to the very mind of the signers of the papers, but if we are mistaken, if the judge below has read their intention better than we (a possibility which we cheerfully admit), still what we decide is equitable, for we hold all the parties entitled to share in all the treasures of the hills, according to their respective interests. If

this took away from some an exclusive interest for which they had paid, there would be no equity in such a rule of decision, but as it simply prevents the taking, without compensation, of an exclusive interest by one tenant in common to the prejudice of his co-tenants, it is exactly the case in which equality is equity.

After the execution of the agreement of 30th August 1787, the referees made their report, dated 31st August 1787, wherein they allotted to Curtis Grubb and Robert Coleman Cornwall Furnace, and certain tracts of land "referred to in a draft or plot made by Thomas Clark, viz., No. 1 and No. 2, containing seven hundred and fifty acres, excepting thereout the draft of the ore banks and hills lately surveyed by the said Thomas Clark;" to Curtis Grubb they allotted Union Forge, situate on Swatara Creek, and certain lands; and to Burd Grubb and Henry Bates Grubb they allotted Hopewell Forges and certain lands—they fixed the sums to be paid back and forth for owelty, and they concluded their report by providing that the tract of land called Bigham's Place, at Conewago, and a small tract of forty acres adjoining thereto, and "also the ore-banks and mine-hills of Cornwall Furnace do still remain undivided, to be held by the said Curtis Grubb, Robert Coleman, Burd Grubb, and Henry Bates Grubb, as tenants in common, according to their respective shares, and to the covenants and articles in the said agreement hereinbefore recited, contained." Their report was filed in the amicable actions which had been instituted in the Courts of Common Pleas of Lancaster and Dauphin counties, was duly confirmed by said courts, and remains there an imperishable record that the "ore-banks and mine-hills were not divided," the ore-banks and mine-hills as Nature made them, not as Clark surveyed them.

It looks very much as if this paper had been prepared whilst it was expected the hills were to be divided according to the Clark draft, and then, after the execution of the papers of the 31st August, the concluding clause was added, inadvertently leaving the allusion to the Clark survey in the beginning of the report unchanged. But this is necessarily only a conjecture. The learned counsel ground an argument on that exception of the Clark survey out of the partition. They say it shows that all that was not within the survey was divided.

Taking the report altogether we think that no such inference can be fairly drawn. But even if it could, we are to remember that this was an amicable partition, and that the referees acted under the written agreements of the parties. Now, if the parties had withdrawn the mine-hills from the jurisdiction of the referees and agreed to hold them in common, the report was a nullity so far as it affected to divide them. They could not give any part of the hills to Curtis Grubb and Robert Coleman in severalty,

and exclude the heirs of Peter Grubb, if, the day before, Curtis Grubb and Robert Coleman had agreed to hold the whole of the hills in common with the heirs undivided. They were controlled necessarily by the agreements of the parties. The question, therefore, is thrown back upon the construction of the agreements. The question of construction embraces the whole case. If the agreements of the 30th August exempted the whole of the hills from partition, they *are* exempted, and that such was the tenor of the paper, we have endeavoured to show. The report tends to confirm our construction not only by its concluding clause, to which I have referred, but by its allotment of furnaces and forges to each of the tenants in common; for the benefit of which each party would need the same free connection with the mine-hills in future which they had enjoyed theretofore.

One other suggestion of counsel is worthy of notice. It is said our construction will interfere with the rights of private property in Cornwall Furnace and its appurtenances, which are on the big iron hill. Not necessarily, for that furnace was allotted to Curtis Grubb and Robert Coleman in severalty, and if it was a part of one of the hills it has so long been held adversely to the other tenants in common as to perfect the title of the present owners. When the judgment of partition was rendered in the suit of 1851, a lot was excepted out, upon proof that it was held adversely by one of the defendants, and I understand that to be part of the same lot to which this allusion of counsel applies. If there was a several title to it then, the lapse of time has bettered that title.

But even if the improvements of one tenant in common be upon the undivided estate, and cannot be held under the Statute of Limitations, equity would compel the co-tenants to compensate the party who made the improvements, before they would be permitted to enure to the common benefit of all the tenants. An account between the co-tenants would be a ready means of adjusting their respective equities as well for improvements made upon, as for profits derived from the common estate.

And this complaint about disturbing the private rights of parties, leads me to notice the extravagant length to which the learned judge pushed our former ruling. He told the jury twice that it extended the privilege of mining to all the tenants in common "throughout the whole Cornwall estate." I believe that was the name by which the whole estate, consisting of many hundred acres of lands, was known before partition was made in 1787. If the learned judge meant to say that we had decided that the tenants in common might mine on any of these lands beyond the natural boundaries of the hills, he misconstrued our instructions. We never made any such decision. No thought of permitting the tenants to mine on lands lying beyond the

[Coleman *et al. v.* Blewett.]

natural boundaries of the hills, and which had been assigned to others in severalty, was ever entertained or expressed upon this bench. The speculative views that were suggested in 11 Harris 409, had reference to the mode of mining within the hills, and were not predicated of the rights of property. They certainly do not warrant the large inference of the judge below, and besides them, we know of no casual observations even that could be thought to warrant it.

We will add, in conclusion, that it may be worthy of the consideration of counsel whether a bill in equity would not be the appropriate mode of defining the natural boundaries of the hills. It is possible that equity enough to support such a bill can be found in the circumstances of the owners of the hills and of the adjacent lands, and that a commission appointed out of a court of equity would either adopt the waters that surround the hills as their appropriate boundaries, or mark and set such other bounds as would save litigation in future.

A summary of our reasons for adhering to the construction we have heretofore given to the agreements of 20th August 1787, may be stated thus :—

1st. That construction is according to the terms of the agreement.

2d. It is sanctioned by the contemporaneous construction of the parties, and those claiming under them, as evinced by their use of the premises.

3d. It is equitable.

4th. The agreements, with the necessary judicial construction of them, became a part of the judicial record of the partition of the residue of the estate, constituting thus a link in the chain of title, and estopping all parties.

5th. The Clark survey, so called, was not the "*accurate*" survey, by which the parties meant to hold the hills in common.

6th. It was not annexed to the agreements, nor incorporated into them, nor in any manner made a part of them, and was referred to in the agreements only to be set aside and disregarded.

7th. To permit such a survey to subvert the plainly-expressed intentions of the parties would be against reason, equity, and justice.

The judgment is affirmed.